IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

ANGELA DARR                                                    PLAINTIFF

              v.                        Civil No. 10-3065

MICHAEL J.  ASTRUE, Commissioner
Social Security Administration                                 DEFENDANT

## MEMORANDUM OPINION

Plaintiff, Angela Darr, brings this action under 42 U.S.C. § 405(g), seeking judicial review of

a decision of the Commissioner of Social Security Administration (Commissioner) denying her claim

for supplemental insurance ("SSI")  under Title XVI of the Social Security Act (hereinafter "the Act"),

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  In this judicial review, the court must determine whether

there is substantial evidence in the administrative record to support the Commissioner's decision. *See*

42 U.S.C. § 405(g).

I.        **Procedural Background:**

The plaintiff filed her application for SSI on January 23, 2007, alleging an onset date of

December 30, 2005, due to fibromyalgia, obesity, osteoarthritis, possible carpal tunnel syndrome,

borderline intellectual functioning, and depression.  Tr. 101-105, 144, 150-151, 172, 184, 187, 188. The

Commissioner denied Plaintiff's application initially and on reconsideration.  Tr. 53-54, 68-70, 75-76.

An administrative hearing was held on March 25, 2009.  Tr. 17-52.  Plaintiff was present and represented

by counsel.

At the time of the hearing, Plaintiff was 34 years old and possessed a high school education.  Tr.

22.  She had past relevant work experience as a housekeeper, machine operator, and laborer/fast food

worker.  Tr. 145, 160, 164-170.

On March 26, 2009, the day after the hearing, Plaintiff protectively filed an application for disability insurance benefits ("DIB").[1]  On April 24, 2009, Plaintiff's DIB claim was consolidated with her pending SSI claim, and pursuant to her request, her claim was escalated to the hearing level.  Tr. 21-22, 127-129.

On June 30, 2009, the ALJ found plaintiff's degenerative disk disease, fibromyalgia, borderline intellectual functioning, and depression to be severe, but concluded they did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.  Tr. 60-64.  After partially discrediting plaintiff's subjective complaints, the ALJ determined that plaintiff retained the residual functional capacity ("RFC") to perform light work with occasional climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling and frequent handling of objects with the upper extremities.  She also found Plaintiff to be limited in her ability to interact appropriately with others.  Tr. 64-66.  With the assistance of a vocational expert, the ALJ found plaintiff could perform her PRW as a maid and plastics machine operator.  Tr. 66-67.

Plaintiff appealed this decision to the Appeals Council, but said request for review was denied on June 17, 2010.  Tr. 1-4.  Subsequently, plaintiff filed this action.  ECF No. 1.  This case is before the undersigned by consent of the parties.  Both parties have filed appeal briefs, and the case is now ready for decision.   ECF No. 9, 10.

II.    **Applicable Law:**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002).  Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision.  The ALJ's decision must be affirmed if the record

---

[1]In her DIB application, Plaintiff alleged her disability did not begin until April 12, 2007.  Tr. 101-105, 117-125.

2

contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that his or her disability, not simply their impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider

3

the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See*

*McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

**III.    Evidence Presented:**

On November 2, 2006, Dr. Caleb Gaston treated Plaintiff at Mountain Home Christian Clinic

("MHCC").  Tr. 222-223.  She complained of pain in both arms and in her leg.  Plaintiff also voiced a

fear of falling, stating that her back would occasionally give out on her.  This was reportedly the result

of injuries sustained in several automobile accidents.  At this time, Plaintiff was working at McDonald's,

using her hands frequently.  Dr. Gaston noted that Plaintiff had previously undergone a nerve conduction

study that revealed possible carpal tunnel syndrome.  However, an examination revealed good strength

in both hands.  There was also no tenderness over the paraspinous muscles and a normal gait.  Dr. Gaston

diagnosed Plaintiff with arm and lower back pain, suspect of osteoarthritis and obesity.  He prescribed

Feldene and lower back stretches and exercises to try to increase the resiliency of her back.  Tr. 222-223.

On December 7, 2006, Plaintiff was treated by Dr. Paul Wilbur at the MHCC.  Tr. 220-221.

Records indicate that she was obese and complained of back, shoulder, leg, and knee pain.  She had

begun working at McDonald's and indicated that, due to muscular pain, she was in tears by the end of

her shift.  The Feldene previously prescribed was apparently not working.  An examination revealed a

good range of motion in her back, but her muscles were tender in the upper back, shoulder, and

paraspinal areas.  Dr. Wilbur explained to Plaintiff that the pain was likely related to her weight and that

working would cause pain until she became accustom to the activity.  He prescribed Motrin and Ultram.

Tr. 220-221.

On April 7, 2007, Plaintiff was treated in the Baxter Regional Medical Center Emergency Room

for costochondritis.  Tr. 228-229.

On May 7, 2007, x-rays of Plaintiff's cervical spine revealed straightening with slight

hyperflexion of the upper three segments and early anterior subluxation questioned at the C2-3 level.

Tr. 231, 281, 325. Slight dextroconvex scoliosis, and osteophytic compromise of the neural foramen bilaterally were also noted. Tr. 231, 281, 325.

On May 15, 2007, Dr. Wilbur referred Plaintiff to Dr. Safwan Sakr for evaluation of her degenerative joint disease ("DJD"). Tr. 302. His nurse called and spoke to Dr. Sakr's office regarding Plaintiff's financial status. Plaintiff was advised to apply for financial assistance at the hospital. If she did not qualify, Plaintiff was to pay $100.00 for her first visit and set up a payment plan for her care. Tr. 302.

On June 21, 2007, Plaintiff consulted with rheumatologist Dr. Safwan Sakr. Tr. 261-265, 297-301. She complained of wide spread joint and muscle aches associated with fatigue, depression, and non-restorative sleep. Plaintiff also reported swelling, especially in both hands, headaches, vertigo, depression, and anxiety. Her current medications were Ultram, Motrin, Meclizine, Amitriptyline, and Arthrotec. An examination revealed straight leg raising within normal limits, negative Tinel's and Phalen's signs on both sides, negative Schober's test, and no focalities either sensorial or motor. Plaintiff also exhibited fair proximal and distal muscle strength in all muscle groups, no frank synovitis, fair curl and grip in both hands, painful limited extension and flexion in the cervical spine, diffusely tender peripheral joints with no swelling and a fair range of motion, well rotation of the hips in acetabelum, and 18/18 fibromyalgia tender points. Dr. Sakr diagnosed Plaintiff with fibromyalgia and early degenerative disk disease ("DDD") of the cervical spine. He prescribed acquatic pool therapy, Flexeril, Cymbalta, Ultram, and Tylenol. Tr. 261-265.

On June 28, 2007, an MRI of Plaintiff's cervical spine revealed abnormal findings at the C3-4, C4-5, and C5-6 levels. Tr. 280, 320. The cord did not have any edema or a syrinx, but there was central canal and neuroforaminal stenosis secondary to disk disease and bony spurring. Tr. 280.

On October 30, 2007, Plaintiff reported that her current medications were Ultram, Flexeril, Motrin, and Celebrex. Tr. 287, 448.

5

On November 15, 2007, Plaintiff reported that the Ultram made her feel drunk, sick to her stomach, and light headed. Tr. 286. She wanted something that would allow her to work without pain. Accordingly, she was directed to discontinue the Ultram and prescribed an increased dosage of Celebrex. Tr. 286.

On at least two additional occasions between June 2007 and January 2008, Plaintiff was treated by Dr. Sakr for wide spread aches and fatigue. Tr. 294-296. She was repeatedly diagnosed with fibromyalgia and DDD. Tr. 294-296. In January 2008, Lyrica was prescribed. Tr. 294-296.

On March 6, 2008, Plaintiff complained of lower thoracic pain. Tr. 284. Stiffness and a decreased range of motion were noted. Urinary symptoms were denied. The doctor diagnosed her with chronic back pain and a urinary tract infection. She was prescribed Cipro. Tr. 284.

On March 11, 2008, Plaintiff was again treated for back pain. Tr. 283. She was working at McDonald's, standing on her feet all day. The nurse noted no cerebrovascular tenderness or urinary tract infection symptoms. An examination revealed pain from the mid-upper back to the lower back. Plaintiff was prescribed Tramadol. Tr. 283.

On July 31, 2008, Plaintiff was treated in the emergency room after an intentional overdose on Flexeril. Tr. 340-347. She was evaluated by Ozark Counseling Services while in the ER, and transfer to St. Vincent's Hospital in Little Rock was arranged. Her transfer diagnoses were intentional overdose with suicidal ideation, depression, fibromyalgia, and mild hyponatremia. Tr. 341.

On August 1, 2008, Plaintiff was admitted to the Center for Behavioral Health at St. Vincent's hospital. Tr. 351-423. She had reportedly become upset when her daughter's father broke up with her and returned to his wife. Because she had recently moved in with him, she no longer had housing. Plaintiff became upset and took a large amount of Flexeril. She also admitted to recently abusing alcohol, but indicated this was a new behavior. No emergency treatment was required. Plaintiff denied thoughts of harming herself, exhibited an "okay" mood, had a dysphoric affect, expressed linear and

6

goal-directed thoughts, and appeared to have average intelligence with a good fund of knowledge. No evidence of psychosis was noted, and her judgment and insight were rated at fairly poor with high impulsivity. Dr. John Downs diagnosed her with major depressive disorder, borderline personality traits, fibromyalgia, and obesity. She was also assessed with a GAF of 48. Plaintiff was admitted to the acute psychiatric unit under general admission protocol. Plaintiff continued to deny suicidal intentions, rather stating she was merely upset and wanted to sleep. Plaintiff agreed she was in need of outpatient counseling, but preferred to follow-up at her local mental health center. On August 5, 2008, Plaintiff was discharged from the Center for Behavioral Health. Tr. 291. Records indicate that she was to follow-up with Ozark Counseling Services. Over the course of her treatment, her depressive symptoms had significantly decreased. Suicidal and homicidal ideation, hallucinations and delusions were all denied upon discharge. Tr. 291.

On September 18, 2008, Plaintiff underwent a mental diagnostic evaluation with Dr. Robert Hudson. Tr. 328-333. Plaintiff alleged pain from a variety of sources, but particularly in the arms, leg, and back. She reported a diagnosis of fibromyalgia, and complained of depression for which she had been prescribed Cymbalta. Approximately two months prior, she had taken an overdose of Flexaril and spent three or four days in the behavioral unit at St. Vincent's hospital. Upon discharge, she relocated to Donaldson, Arkansas, where she was now living with a relatively new boyfriend. Plaintiff was adamant that her overdose was not a suicide attempt. Dr. Hudson noted that Plaintiff had two children, both of which were in the custody of other family members. The implication was that Plaintiff could marginally care for herself, much less a family.

Plaintiff reported sexual abuse as a child, resulting in her placement in foster care from age 10 to age 18. She was reportedly treated via counseling throughout this time, and reported a history of psychotropic medications. Plaintiff stated that she was in special education in school, but did graduate high school in 1993. She voiced a belief that she was labeled as mentally retarded, at least for a while.

7

Dr. Hudson noted that Plaintiff had attempted a certified nurses's aid program, which was very hands on and required minimal literacy, but was reportedly unable to complete it. Until her hospitalization, Plaintiff had worked at McDonald's as an order taker. She indicated that her position was part-time, as her attorney had advised her not to work over 35 hours per week. She had good rapport, was pleasant and cooperative, was mildly dysthymic, had a normal range of emotion, appeared to exhibit logical and relevant thoughts, had intact associations, exhibited no signs of delusions or bizarre obsessions, and denied suicidal ideations or preoccupations. Her Beck depression inventory score fell within the mild range of depression. The results of her personality inventory suggested a naive individual who had many complaints of pain and physical illness, but appeared to be responding honestly. Dr. Hudson diagnosed Plaintiff with depressive disorder not otherwise specified, anxiety disorder not otherwise specified with possible post-traumatic stress disorder related to the sexual abuse, and probable borderline intellectual functioning. He then assessed her with a GAF of 55. He noted that her primary problems were physical and a reaction to her pain. However, it did appear that she might be developing a cognitive concern (*e.g.*, very poor digits reversed with adequate forward), and he believed this necessitated further testing and evaluation. Tr. 328-333.

Dr. Hudson also completed a mental RFC assessment. Tr. 334-336. He found Plaintiff to be moderately to extremely limited with regard to making judgments on complex work-related decisions; markedly limited in the areas of carrying out complex instructions; and, moderately limited regarding understanding and remembering complex instructions, interacting appropriately with supervisors, and responding appropriately to usual work situations and to changes in a routine work setting. Tr. 334-336.

On April 20, 2009, Plaintiff underwent a neuropsychological evaluation with Dr. Vann Smith. Tr. 425-433. He indicated that Plaintiff had been referred by her attorney for a history of worsening neurocognitive symptoms including impaired concentration, affective lability, work finding impairment, sleep pattern disturbance, and episodic executive dysfunction. She described her overall health as poor,

relaying a history of DDD, DJD, two closed head injuries secondary to motor vehicle accidents, and chronic pain.  Dr. Smith noted that her history was negative for psychiatric attention, aside from a previous social security disability evaluation.   However, although Dr. Smith indicated that Plaintiff's medical records were requested, those records were not actually available at the time of his evaluation.

A neurocognitive status exam revealed orientation in all spheres, impaired memory, grossly intact judgment and insight, no evidence of an associational anomaly, no hallucinatory or delusional phenomena, and functional thought processes.  Her full scale IQ was 85, evidencing low average intelligence.  Dr. Smith diagnosed Plaintiff with fibromyalgia, cognitive dysfunction; DDD; DJD; and, chronic, non-psychogenic, multifocal, and poorly controlled pain disorder.  He indicated that her test results revealed a pattern of abnormal findings consistent with traumatic brain insult and the dysregulation of key central neurochemistry and neurophysiology believed now to be precipitated by the brain and spinal cord's adaptive response to chronically painful disease process.  Dr. Smith stated that her resulting neurocognitive symptoms interfered with her capacity to carry out routine daily activities in a consistent manner and, in his opinion, rendered her disabled.

Dr. Smith also completed a mental RFC assessment.  He assessed her with a GAF of 40-45, and marked her prognosis as only fair.  He then concluded Plaintiff would be unable to meet competitive standards with regard to remembering work-like procedures; maintaining attention for two hour segments; maintaining regular attendance and being punctual within customary usually strict tolerances; sustaining an ordinary routine without special supervision; completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; understanding, remembering, and carrying out detailed instructions; setting realistic goals or making plans independently of others; and dealing with the stress of semiskilled work.  Tr. 425-433.

9

On February 12, 2009, Plaintiff again complained of pain in her shoulders, legs, and knees. Tr. 440. The doctor at Charitable Christian Medical Clinic diagnosed her with depression, morbid obesity, tobacco abuse, fibromyalgia, and gastroesophageal reflux disorder. Plaintiff was prescribed Cymbalta, Celebrex, Nexium, and Flexeril. Tr. 441.

On September 18, 2008, Plaintiff complained of dizzy spells and nausea. Tr. 445. She was diagnosed with vertigo and prescribed Antivert. Tr. 445.

On July 2, 2009, Plaintiff indicated that her medication was no longer working. Tr. 444. She reported increased anxiety and depression. The nurse practitioner at MHCC noted that Plaintiff cried easily and was very anxious and emotional. Plaintiff was diagnosed with depression and bipolar, and prescribed Seroquel to add to her daily medication regimen. Tr. 444.

## IV. Discussion:

Plaintiff contends that the ALJ erred by failing to provide specific and substantial reasons for discounting Plaintiff's credibility and failing to develop the record regarding listing 12.05. We will begin our analysis with a review of Plaintiff's subjective complaints.

### A. Subjective Complaints/Credibility:

When evaluating the credibility of plaintiff's subjective complaints the ALJ is required to make an express credibility determination detailing his reasons for discrediting the testimony. *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001).

The standard of evaluation is not whether plaintiff experiences pain, but if the pain alleged is intense enough to cause functional limitations. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (holding that the real issue is not whether the plaintiff is experiencing pain, but how severe and whether it prevents him from performing any kind of work).

An ALJ may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir.

10

1984).  The ALJ is required to take into account the following factors in evaluating the credibility of a claimant's subjective complaints:  (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions.  *See id.*  The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him or her to reject the plaintiff's complaints.  *Masterson v. Barnhart,* 363 F.3d 731, 738 (8th Cir.2004).  However, the ALJ need not explicitly discuss each *Polaski* factor.  *Strongson v. Barnhart,* 361 F.3d 1066, 1072 (8th Cir.2004).  The ALJ only need acknowledge and consider those factors before discounting a claimant's subjective complaints.  *Id.*  Even so, the ALJ may discount a claimant's subjective complaints if there are inconsistencies between the alleged impairments and the evidence as a whole.  *Dunahoo v. Apfel*, 241 F.3d 1033, 1037 (8th Cir. 2001); *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001).

        1.    **Physical Limitations:**

     In the present case, plaintiff alleged disability due to fibromyalgia, obesity, osteoarthritis, and possible carpal tunnel syndrome.  It was noted in 2006, that Plaintiff had undergone nerve conduction studies revealing possible carpal tunnel syndrome.  However, an examination revealed good strength in both hands and no further complaints were documented.  Tr. 222-223.  *See Forte v. Barnhart*, 377 F.3d 892, 895 (8th Cir. 2004) (holding that lack of objective medical evidence is a factor an ALJ may consider).

     On numerous occasions, Plaintiff was also treated for  back, shoulder, leg, and knee pain.  Dr. Sakr diagnosed Plaintiff with fibromyalgia, finding that she exhibited 18/18 possible tender points.  An MRI of her cervical spine revealed central canal and neuroforaminal stenosis secondary to disk disease and bony spurring at multiple levels.  Tr. 280.  Further, x-rays had shown straightening with slight hyperflexion of the upper three segments, possible early anterior subluxation at the C2-3 level, slight dextroconvex scoliosis, and osteophytic compromise of the neural foramen bilaterally. Tr. 231, 281, 325.

11

However, physical exams yielded only tenderness and minimal range of motion limitations. Conservative measures were used to treat her pain, consisting primarily of prescriptions for Ultram, Motrin, Amitriptyline, and Lyrica. *See Smith v. Shalala*, 987 F.2d 1371, 1374 (8th Cir. 1993) (holding that treating physician's conservative treatment was inconsistent with plaintiff's allegations of disabling pain).

Further, the record contains no evidence of emergency room visits or hospitalizations resulting from her alleged severe and disabling pain. In fact, Plaintiff continued to work at McDonald's, reportedly standing on her feet all day, until her overdose in July 2008. She also remained able to perform household chores, care for herself, and care for a child with ADHD. Thus, while we do believe Plaintiff suffered from a moderate level of pain, we do not find that the evidence supports a finding of disability due to fibromyalgia, degenerative disk disease, or osteoarthritis.

  2. **Mental Impairments:**

Plaintiff also alleged disability due to borderline intellectual functioning and depression. Dr. Hudson examined Plaintiff in 2008 and diagnosed her with *probable* borderline intellectual functioning. Tr. 328-333. He was of the opinion that further evaluation was necessary. Dr. Smith examined Plaintiff in 2009, and after administering the WAIS, determined that her full scale IQ was 85. Tr. 425-433. He did not, however diagnose her with borderline intellectual functioning. And, we note that the doctors treating Plaintiff during her psychiatric hospitalization in July/August 2008, without testing, estimated her intelligence to fall within the average range of intellect with an adequate of knowledge. Tr. 351-423.

Further, in spite of her alleged borderline intellectual functioning, the record reveals that Plaintiff retained the ability to work at least part-time at McDonald's, read, work puzzle books, care for her own finances, and meet her own personal needs. She also reported the ability to care for a son with ADHD. We believe these activities make it clear that Plaintiff's intellectual functioning did not prohibit her from working.

The record also indicates that Plaintiff was suffering from depression and had been prescribed antidepressants.  However, there is no real evidence to indicate that her depression was disabling.  In fact, her Beck depression inventory score fell within the mild range of depression, and the medications prescribed to treat it appear to have been effective.  Tr. 328-333. There are really only two records that reference the possibility of limitations associated with depression.  On July 31, 2008, Plaintiff was treated in the emergency room after an intentional overdose on Flexeril.  Tr. 340-347.  She adamantly denied that this was a suicide attempt, stating that she was merely upset and wanted to sleep.  And, over the course of her five day inpatient treatment, her depressive symptoms significantly decreased.  Then, on July 2, 2009, Plaintiff indicated that her medication was no longer working.  Tr. 444.  She reported increased anxiety and depression.  The nurse practitioner at MHCC noted that Plaintiff cried easily and was very anxious and emotional.  Plaintiff was diagnosed with depression and bipolar, and prescribed Seroquel to add to her daily medication regimen.  Tr. 444.

We note that the treatment Plaintiff received for her depression consisted only of medication through her primary care physician and four to five days of inpatient counseling.  Tr. 351-423.  There is no indication that Plaintiff participated in outpatient counseling, as she was directed to do upon her discharge from the behavioral unit at St. Vincent's.  *See Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007) (holding that the lack of formal treatment by a psychiatrist, psychologist, or other mental health professional is a significant consideration when evaluating Plaintiff's allegations of disability due to a mental impairment).  Further, as enumerated above, we note that Plaintiff remained able to perform many activities that would be impossible if she suffered from a disabling level of depression.  Accordingly, we do not believe the ALJ erred in concluding that, although severe, Plaintiff's depression was not disabling.

While we do note Dr. Hudson's suggestion that they might also be an element of cognitive dysfunction, and Dr. Smith's assessment of cognitive dysfunction, we are also cognizant of the fact that

13

this alleged cognitive impairment did not prevent Plaintiff from holding down a part-time job, caring for her home, and caring for her child.  Dr. Smith also has a history of diagnosing individuals with cognitive dysfunction based on self reports of head injuries and concussions that are, as in the present case, unsubstantiated by the record.

Plaintiff did report an inability to complete a CNA program, due to the reading and time involved in completing the assignments.  However, given the fact that she was able to perform all of the activities identified in the section below, we believe the evidence shows that her *possible* cognitive dysfunction was not severe enough to interfere with her ability to perform work-related activities.  Having said that, should Plaintiff's cognitive issues deteriorate in the future, she should confer with her attorney regarding her ability to file a new claim for benefits.

### 3.     Activities of Daily Living:

Plaintiff's own reports concerning her daily activities also undermine her claim of disability. On March 12, 2007, Plaintiff completed an adult function report indicating her daily activities consisted of going to work, coming home, cleaning the house, cooking, and doing the laundry.  Tr. 152-157.  She also reported the ability to care for her son who suffered from ADHD and bipolar, care for her own personal hygiene, prepare meals daily, clean the house, do the laundry, wash the dishes, drive a car, shop in stores for food and clothing, pay bills, count change, handle a savings account, use a checkbook/money orders, take her children to the park and bowling, read, watch television, work puzzle books, do crafts, and visit friends.  Further, Plaintiff reported following spoken and written instructions well, getting along well with authority figures, and the ability to handle changes in routine.  Tr. 158.  On forms she completed for her attorney, Plaintiff also reported the ability to drive, cook, wash dishes, clean house, dust, participate in organizations, play cards/games, exercise, and participate in other activities daily; cook, vacuum, mop the floor, do laundry, grocery shop, perform hobbies, and visit relatives and friends weekly; and, make the bed, perform yard work, pay bills, handle finances, and talk to neighbors

14

monthly.  Tr. 211.  Further, she indicated that she could sit continuously for one to two hours before

having to get up and move around or lie down, could stand continuously for only thirty minutes to one

hour, and could continuously walk for fifteen to thirty minutes.  Tr. 213.  *See Pena v. Chater*, 76 F.3d

906, 908 (8th Cir. 1996) (ability to care for one child, occasionally drive, and sometimes go to the store);

*Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996) (ability to visit neighbors, cook, do laundry, and

attend church); *Novotny v. Chater*, 72 F.3d at 671 (ability to carry out garbage, carry grocery bags, and

drive); *Johnston v. Shalala*, 42 F.3d 448, 451 (8th Cir. 1994) (claimant's ability to read, watch television,

and drive indicated his pain did not interfere with his ability to concentrate); *Woolf v. Shalala*, 3 F.3d

1210, 1213-1214 (8th Cir. 1993) (ability to live alone, drive, grocery shop, and perform housework with

some help from a neighbor).  Clearly these activities are not consistent with a claim of total disability.

Perhaps the most damaging, however, is the fact that Plaintiff continued to work at McDonald's

until mid-to-latter 2008.  She claimed to have stopped working when she was admitted to the hospital

in July in 2008.  However, in September 2008, she reported to Dr. Hudson that she was still working at

McDonald's.  She indicated that she worked part-time because her attorney told her she could not work

more than 35 hours per week.  *See Curran-Kicksey v. Barnhart*, 315 F.3d 964, 969 (8th Cir. 2003)

(holding that even part-time work is inconsistent with claim of disability).  This does not support her

allegations of disability.

Although Plaintiff may suffer from serious pain and be unable to work without discomfort, she

has continued to work despite her alleged pain.  We recognize that if Plaintiff had decided not to work,

she might have qualified for disability benefits because she may have been able to prove that she was

incapable of engaging in substantial gainful activity for at least twelve months.  *See Nettles v. Sullivan*,

956 F.2d 820, 823 (8th Cir. 1992).  However, the fact that she had worked is at least some evidence of

her ability to perform some work-related activities.  *See* 20 C.F.R. § 404.1571 ("Even if the work you

have done was not substantial gainful activity, it may show that you are able to do more work than you

actually did.  We will consider all of the medical and vocational evidence in your file to determine whether or not you have the ability to engage in substantial gainful activity.").  Accordingly, we can not say that Plaintiff has proven her disability, not simply her impairment or pain, has lasted for at least twelve consecutive months.  *See Trenary v. Bowen*, 898F.2d 1361, 1364 (8th Cir. 1990) (holding that a mere diagnosis is not sufficient to prove disability, absent some evidence to establish a functional loss resulting from that diagnosis).

      **B.**    <u>**Listing 12.05:**</u>

Plaintiff alleges that the ALJ failed to develop the record with regard to whether her impairment met listing 12.05 for mental retardation because Dr. Hudson diagnosed her with probable borderline intellectual functioning and recommended that she be evaluated further, to include intelligence testing. The ALJ owes a duty to a claimant to develop the record fully and fairly to ensure her decision is an informed decision based on sufficient facts.  *See Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004). In determining whether an ALJ has fully and fairly developed the record, the proper inquiry is whether the record contained sufficient evidence for the ALJ to make an informed decision.  *See Haley v. Massanari*, 258 F.3d 742, 748 (8th Cir. 2001). The ALJ is only required to develop a reasonably complete record. *See Clark v. Shalala*, 28 F.3d 828, 830 (8th Cir. 1994).

Likewise, both Eighth Circuit case law and the regulations recognize that at step three of the sequential evaluation process, the burden remains on Plaintiff to establish that her impairment meets or equals an impairment enumerated in the listings, not upon the Commissioner to prove that Plaintiff does not satisfy a listing. *See Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004); 20 C.F.R. §§ 404.1520(d) 416.920(d). Therefore, it is also the Plaintiff's responsibility to present the strongest case possible.  *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991).

Contrary to Plaintiff's allegation, the ALJ specifically considered and properly determined that Plaintiff's borderline intellectual functioning impairment did not meet or equal

listing 12.05 for mental retardation.  Tr. 61-63.  The diagnostic description contained in listing 12.05 provides as follows:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

20 C.F.R. pt. 404, subpt. P, app. 1, listing 12.05.  In explaining the mental disorder listings, the regulations provide that listing 12.05 "is different from that of the other mental disorders listings . . . [in that it] contains an introductory paragraph with the diagnostic description for mental retardation." *See* 20 C.F.R. pt. 404, subpt. P, app. 1, section 12.00A.  In order for Plaintiff's impairment to meet this listing, it must satisfy "the diagnostic description in the introductory paragraph" of listing 12.05. *Id*.  The ALJ properly found that Plaintiff's impairment did not satisfy the diagnostic description in the introductory paragraph, as the medical evidence did not document significantly sub-average general intellectual functioning with deficits in adaptive functioning, initially manifested during the development period prior to age 22.  Tr. 62.  A claimant must manifest all the specified criteria of a particular listing to qualify for disability under that listing.  *See Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

The ALJ found that Plaintiff had been assessed with borderline intellectual functioning, which appeared to have been ongoing throughout her work history.  Tr. 66.  *See Goff v. Barnhart,* 421 F.3d 785, 793 (8th Cir. 2005) (holding absent a showing of deterioration, working after the onset of an impairment is some evidence of an ability to work); *Gowell v. Apfel,* 242 F.3d 793, 798 (8th Cir. 2001) (same).  However, she also found that the medical evidence did not show that Plaintiff met the requirements of sections A, B, C, or D.  There was no evidence to indicate that Plaintiff depended on others for her personal needs or was unable to follow directions such that the use of standardized measures of intellectual functioning were precluded as is required by section A.  Tr. 62.  *See* 20 C.F.R. pt. 404, subpt. P, app. 1, listing 12.05A.  The evidence supports this conclusion, as Plaintiff reported no problems with

17

following instructions, could meet her own personal hygiene needs, and was able to prepare meals for her family on a daily basis, manage her finances, shop in stores alone, drive a car, and care for a son with ADHD.  Tr. 62, 153-155.

Plaintiff also failed to meet the criteria of section B because the evidence did not show a full-scale IQ of 59 or less.  Further, she did not meet the criteria of listing 12.05C because the evidence did not show a full-scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation.  Tr. 62.  *See* 20 C.F.R. pt. 404, subpt. P, app. 1, listing 12.05B-C.  As previously mentioned, the IQ test administered by Dr. Smith revealed a borderline to low average intelligence score of 85.  This is clearly higher than the 59 or less required in section B and the 70 or below required to meet section D's requirements.

Finally, Plaintiff did not satisfy the criteria of section D because she did not have a verbal, performance, or full-scale IQ of 60 through 70 and two of the following: marked restriction in activities of daily living; marked difficulty in social functioning, marked difficulty in maintaining concentration; persistence, or pace; or repeated episodes of decompensation of extended duration.  Tr. 62.  *See* 20 C.F.R. pt. 404, subpt. P, app. 1, listing 12.05D.  Although Plaintiff's IQ score clearly did not fall within the range applicable to this section, the ALJ went ahead and evaluated her abilities in the listed areas. Regarding Plaintiff's activities of daily living, the ALJ found no limitations, noting that she cared for her son, who is affected by ADHD; performed household chores, although she sometimes had assistance with vacuuming and mopping because of back pain; prepared family meals; shopped alone for groceries and household items; managed her own finances; drove a car; and, had no problems caring for her own personal hygiene.  Tr. 62, 152-155.  The ALJ also found Plaintiff to have only mild difficulties in social functioning, as she lived with a male companion; cared for her son; had contact with her daughter; maintained relationships with other family members and friends; could shop in stores alone; and, got along well with supervisors and the public.  Tr. 63, 152, 155-157, 329.  She was also able to work at

18

McDonald's through July 2008 and reported to her attorney that she could participate in organizational activities daily. The ALJ assessed her with moderate difficulties with concentration, persistence, or pace, due to her chronic pain. Tr. 63, 150-151. She found that some or all of the medications prescribed to treat this pain had potential adverse side effects, and, as a result, Plaintiff experienced irregular sleep that caused fatigue. Tr. 63, 150-151. We find support for a finding of only moderate difficulties in the fact that Plaintiff reported reading for pleasure, said she could probably read and understand the basics of an article in the newspaper, and indicated that she could fill out a job application. Tr. 331. She also reported the ability to watch television and play games/cards. As for episodes of decompensation, none were noted. And, the evidence of record does not reveal any decompensation, especially in light of the fact that Plaintiff adamantly denied that her overdose in July 2008 was a suicide attempt. Instead, she alleged that she was just tired and in pain and wanted to get some sleep. Accordingly, we find that substantial evidence supported the ALJ's determination that Plaintiff's impairment did not meet the criteria for listing 12.05D.

Plaintiff's allegation that the ALJ should have ordered IQ testing is also without merit. Dr. Smith performed IQ testing via the WAIS-R on April 20, 2009, at which time Plaintiff earned a full scale score of 85. Tr. 426. we note that Dr. Smith did not diagnose Plaintiff with borderline intellectual functioning or indicate that further testing would be necessary to determine her level of intellect. During Dr. Hudson's Mental Diagnostic Evaluation in September 2008, he conducted tests and concluded that Plaintiff's primary problems were physical and her reaction to pain, and that she was "probably only slightly above MMR [mild mental retardation] in intellectual functioning and could not be expected to replace her declining physical ability with employment requiring more literacy." Tr. 331. He assessed Plaintiff with *probable* borderline intellectual functioning. Tr. 331. Dr. Hudson found that Plaintiff had no limitation in her ability to understand, remember, and carry-out simple instructions; could handle her own funds; and, had no memory, concentration, or understanding deficits. Tr. 65, 331-332. He

19

specifically noted that no formal IQ tests were given to Plaintiff, and that "[s]uch did not seem necessary or examiner would have called." Tr. 331.

Plaintiff now contends that Dr. Smith did not utilize the preferred version of the WAIS in his testing. However, we can find nothing to indicate that this version of the test yielded unreliable or incorrect results. In fact, Plaintiff's counsel sends many of his clients to this doctor for neuropsychological evaluations and, until now, has raised no issue with the version of the WAIS he utilizes. As such, we do not find that Plaintiff's dissatisfaction with the test version utilized and the test results is a legitimate reason for this Court to remand the case and order additional IQ testing. *See Luckey v. Department of Health & Human Servs.,* 890 F.2d 666, 668-69 (4th Cir. 1989) (ALJ may assume claimant's IQ remained relatively constant in absence of evidence showing a change in claimant's intelligence functioning). The Eighth Circuit has held that an ALJ is not required to order a consultative evaluation of every alleged impairment; he simply has the authority to do so if the existing medical sources do not contain sufficient evidence to make an informed decision. *See Matthews v. Bowen,* 879 F.2d 422, 424 (8th Cir. 1989). We find that the existing sources provided ample evidence upon which the ALJ could base her decision.

**C.      The ALJ's RFC Assessment:**

Plaintiff contends that the ALJ's RFC assessment is not supported by substantial evidence. RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). A disability claimant has the burden of establishing his RFC. *See Masterson v. Barnhart,* 363 F.3d 731, 737 (8th Cir.2004). "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or his limitations." *Eichelberger v. Barnhart,* 390 F.3d 584, 591 (8th Cir. 2004); *Guilliams v. Barnhart,* 393 F.3d 798, 801 (8th Cir. 2005). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of

20

Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003).

The ALJ properly considered plaintiff's subjective complaints, the objective medical evidence, the consultative exams, and the RFC assessment of the non-examining, consultative doctors. On May 22, 2007, Dr. Brad Williams completed a psychiatric review technique form. Tr. 232-245. He found Plaintiff to have no medically determinable impairment. Tr. 232-245.

On June 6, 2007, Dr. Jim Takach completed a physical RFC assessment. Tr. 250-257. After reviewing Plaintiff's medical records, he concluded Plaintiff could perform light work involving only occasional climbing, balancing, stooping, kneeling, crouching, and crawling. He also found Plaintiff should not perform tasks requiring rapid or repetitive wrist movement. Tr. 250-257.

Given the medical evidence indicating that Plaintiff was provided conservative treatment for both her physical and mental impairments and the fact that her physical abilities were never limited by any of her treating doctors, we find substantial evidence to support the ALJ's determination that Plaintiff could perform a range of light work involving occasional climbing, balancing, stooping, kneeling, crouching, and crawling; frequent handling, and a limited ability to interact with others. *See Baldwin v. Barnhart*, 349 F.3d 549, 557 (2003) (physicians noted few abnormalities, and none of Plaintiff's independent physicians restricted or limited Plaintiff's activities). We do note that the ALJ's determination regarding handling differs from that proposed by Dr. Takach. However, we find ample support for the ALJ's assessment in the lack of medical evidence to document an actual functional limitation in this area. And, as previously discussed, the medications prescribed to treat Plaintiff's impairments seemed to keep her remaining impairments under control well enough to prevent the necessity of emergency room treatment, hospitalizations, and surgical intervention. Accordingly,

21

although it is clear that plaintiff suffers from some degree of impairment, she has not established that she is unable to engage in any and all gainful activity. *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) (holding that mere fact that working may cause pain or discomfort does not mandate a finding of disability); *Woolf v. Shalala*, 3 F.3d at 1213 (holding that, although plaintiff did have degenerative disease of the lumbar spine, the evidence did not support a finding of disabled). The ALJ's RFC assessment will stand.

> ### D.      Vocational Expert's Testimony:

Testimony from a vocational expert based on a properly-phrased hypothetical question constitutes substantial evidence. *See Cruze v. Chater,* 85 F.3d 1320, 1323 (8th Cir. 1996); *cf. Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994) (when hypothetical question does not encompass all relevant impairments, VE's testimony does not constitute substantial evidence to support the ALJ's decision). The ALJ's hypothetical question needs to "include only those impairments that the ALJ finds are substantially supported by the record as a whole." *Id.* (citing *Stout v. Shalala,* 988 F.2d 853, 855 (8th Cir.1993)); *see also Morse v. Shalala,* 32 F.3d 1228, 1230 (8th Cir.1994).

The vocational expert indicated that a person of plaintiff's age, education, and work background with the above RFC, could still perform work Plaintiff's PRW as a maid and plastics machine operator. Tr. 47. There is no indication that the expert's testimony conflicts with the Dictionary of Occupational Titles. As the hypothetical question contains the limitations the ALJ found to be substantially supported by the record, we find that the expert's response to the question constitutes substantial evidence of Plaintiff's ability to perform the identified positions.

## V.      Conclusion:

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the plaintiff benefits, and thus the decision should be affirmed. The undersigned further finds that the plaintiff's Complaint should be dismissed with prejudice.

AO72A
(Rev. 8/82)

DATED this <u>9th</u> day of January 2012.

/s/ *J. Marschewski*

HON. JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)